UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 11-cr-10385- |
| ) | |
| v. ) | VIOLATION: |
| ) | 18 U.S.C. § 1623 |
| ) | |
| ) | False Declaration Before Grand Jury |
| MITCHELL SALZMAN ) | |

## INFORMATION

The United States Attorney charges that at times relevant to this Information:

1. The defendant **MITCHELL SALZMAN ("SALZMAN")**, a resident of Florida, was an employee of Company A.

2. Company A manufactured and distributed in interstate commerce medical devices intended for human use, including bone growth stimulators. Bone growth stimulators were externally-worn devices which emitted pulsed electromagnetic fields to stimulate regeneration of bone in connection with spinal fusions, among other uses. Company A sold three bone growth stimulators: the Spinal-Stim and Cervical-Stim, which were used as an adjunct to spinal and cervical fusion surgery, and the Physio-Stim, which was used to treat bones that did not heal properly.

3. **SALZMAN** was a Regional Sales Director for the Southeast Region of Company A, managing approximately 14 Territory Managers. One of these Territory Managers was HR, who was responsible for the territory including Knoxville, Tennessee. Territory Manager HR was one of the top-selling Territory Managers at Company A.

4. In July 2009, Company A terminated Territory Manager HR for forging medical records of doctors who had prescribed bone growth stimulators from Company A. In particular, Territory Manager HR had forged physicians' records related to the timing and nature of certain patients' injuries to meet insurance carrier guidelines regarding coverage of bone growth stimulators, in order to increase the likelihood that these carriers would pay Company A for the devices in question.

5. As a result of the termination of Territory Manager HR, certain managers in the sales force at Company A were concerned that some or all of the business in Knoxville, Tennessee would be lost due to close relationships with physicians that Territory Manager HR had cultivated over the years. Those managers concocted a scheme to pay Territory Manager HR for referrals of bone growth stimulator business in Knoxville, Tennessee, and to conceal those payments from Company A's Compliance Department.

6. Immediately upon leaving Company A, Former Territory Manager HR established Company B to sell medical devices in Tennessee. Former Territory Manager HR registered Company B in the name of his friend JB (hereafter, "front-guy JB"), who had no experience in medical sales, for the purpose of concealing Former Territory Manager HR's involvement with Company B.

7. By on or about August 1, 2009, approximately three weeks after Former Territory Manager HR had been terminated, Company A entered into a contract with Company B whereby Company A paid Company B commissions of 15% on all orders of bone growth stimulator from certain doctors in Tennessee. **SALZMAN** was involved with negotiating the contract with Company B. **SALZMAN** and others at Company A knew that Former Territory Manager HR

was involved with Company B and would benefit from the contract with Company A.

8. In or about December 2010, the replacement Territory Manager in the Knoxville, Tennessee territory, Territory Manager LJ, announced his imminent departure. Thereafter, Company A hired Company B to distribute all bone growth stimulator products in the Knoxville, Tennessee territory.

9. On or about December 8 and December 9, 2010, **SALZMAN** had two dinner meetings with the Territory Manager LJ, Former Territory Manager HR, and an employee of Former Territory Manager HR, Employee ES, to discuss transitioning of all of Company A's business to Company B in the Knoxville, Tennessee area.

10. Between in or about December 2010 and July 2011, **SALZMAN** frequently discussed Former Territory Manager HR's role in Company B with Employee ES. When **SALZMAN** wanted to contact Former Territory Manager HR about Tennessee business, he called Employee ES's cell phone and asked Employee ES to put Former Territory Manager HR on the phone.

11. In or about July 2011, **SALZMAN**'s supervisor, TW, informed **SALZMAN** that Company A suspected that Former Territory Manager HR was involved with Company B and asked **SALZMAN** to confirm if this was true. **SALZMAN** contacted Employee ES and Former Territory Manager HR about Company A's suspicions. **SALZMAN** told Employee ES and Former Territory Manager HR that he would deny ever knowing that Former Territory Manager HR was involved with Company B.

12. In or about August 2011, Company A terminated its contract with Company B.

13. During the time period between July 2009 and September 2011, a grand jury in

Boston, Massachusetts was investigating possible criminal violations by Company A and its employees, including among other areas of misconduct, forging and/or manipulating medical records in connection with orders for bone growth stimulators, and payment of kickbacks to obtain referrals of orders for bone growth stimulators.

14. The allegations in paragraphs one through thirteen are herein incorporated in full.

15. On October 28, 2010, Hon. Joseph L. Tauro, United States District Judge for the District of Massachusetts, issued an Order requiring **SALZMAN** to testify in connection with this investigation. The Order stated that **SALZMAN** had been called to testify before the grand jury, that it was likely that **SALZMAN** would refuse to testify due to his privilege against self-incrimination, and that in the judgement of the United States Attorney, **SALZMAN**'s testimony may be necessary to the public interest. Therefore, pursuant to 18 U.S.C. §§ 6002 and 6003, the Court ordered **SALZMAN** to testify before the grand jury and further ordered that no testimony or information provided by **SALZMAN** could be used against him in any criminal case "except a prosecution for perjury, giving a false statement or otherwise failing to comply with this Order."

### COUNT ONE: 18 U.S.C. § 1623 (FALSE DECLARATION BEFORE GRAND JURY)

16. On or about August 24, 2011, in the District of Massachusetts, the defendant

**MITCHELL SALZMAN**

while under oath and testifying as a witness before a Grand Jury of the United States in the District of Massachusetts, did knowingly make false material declarations regarding his knowledge of Former Territory Manager HR's role and involvement with Company B. **SALZMAN** was asked the following questions and gave the indicated answers:

    Q    Until last month or so, were you aware if [HR], the guy

|   |   |
|---|---|
|   | who had been fired, had any role with [Company B]? |
| A | **I did not know.** |
| Q | Did you know anything one way or the other? |
| A | **No.** |

\* \* \* \* \*

| | |
|---|---|
| Q | What did you come to learn within the last month? |
| A | **Wow. Okay. So, what I found out in the last month was that – from all different sources. Some from here, from internally, that they suspected that [HR] was affiliated with [Company B]. So, I -- again, just because I'm part of the Grand Jury, I had to check to see if it was something that could run down and find out exactly what the truth is.** |

\* \* \* \* \*

| | |
|---|---|
| A | Oh, let me step back. **So, yeah, [Supervisor TW], [TW] told me they suspected that [HR] was part of [Company B].** So, yes, one of the people that I had talked to about that. **So, what I did was I tried to get in touch with [Front-guy JB] to find out if [HR] was part of the [Company B], and I couldn't get, I could not get in touch with, with [JB]. So, what I did was I spoke with [Employee ES].** [ES] was the rep that worked under [Company B]. **I said, you know, 'Well, there is,' well, [TW] said that I could tell him that there is -- that we think that [HR] may be involved with [Company B]. Is there any truth to that? Then, -- as I said, I can't get in touch with [JB]. He said, 'Yes. He's involved with [Company B]. He has nothing to do with stimulation. He carries a -- some other product line, but he has nothing to do with stimulation.' I said -- well, still, he might know the history, but that's -- you gotta tell [JB] to get in touch with me. That's gonna be, that could be a potential problem. Not could be. Will be a potential problem.' So, everything pretty much escalated, and we terminated the relationship because [ES] admitted that [HR] was part of [Company B].** |

5

* * * * *

Q    Did you talk to [HR] about it?

A    **No.**

Q    The only conversation you had with someone who was knowledgeable was [Employee ES]?

A    **Yeah, and [Supervisor TW].**

* * * * *

Q    To this day, do you know what [HR]'s role was within [Company B]?

A.    **I don't know what his role was.**

    17.    **SALZMAN** knew and believed when he gave the above bolded testimony that the statements were false, in that:

    a.    It was false that **SALZMAN** only discovered the "truth" about Former Territory Manager HR's involvement with Company B one month prior to his August 24, 2011 grand jury testimony. In fact, in July and August 2009, when **SALZMAN** began negotiating the Company B contract, **SALZMAN** knew that Former Territory Manager HR was involved with Company B and that HR would benefit from the contract with Company A.

    b.    It was false regarding the nature of the conversation with Employee ES in August 2011. After Supervisor TW informed **SALZMAN** that he suspected that Former Territory Manager HR was involved with Company B, **SALZMAN** did have a conversation with Employee ES, but **SALZMAN** did not ask Employee ES if Former Territory Manager HR was involved with Company B, something **SALZMAN** had

known for two years. Instead, **SALZMAN** merely informed Employee ES and Former Territory Manager HR that Company A suspected Former Territory Manager HR's involvement with Company B, and that **SALZMAN** intended to deny ever knowing that Former Territory Manager HR was involved with Company B.

    c.    It was false that **SALZMAN** never spoke with Former Territory Manager HR about his involvement with Company B. Between August 2009 and August 2011, **SALZMAN** frequently spoke with Former Territory Manager HR about Company B and Former Territory Manager HR's involvement with Company B.

    d.    It was false that, on August 24, 2011, the date that **SALZMAN** testified, he did not know what role Former Territory Manager HR played within Company B. **SALZMAN** knew when he testified that Former Territory Manager HR was involved with Company B and benefitted from the contract with Company A.

All in violation of Title 18, United States Code, Section 1623.

                                  CARMEN M. ORTIZ
                                  United States Attorney

By:

                                DAVID S. SCHUMACHER
                                JEREMY M. STERNBERG
                                Assistant U.S. Attorneys